NUMBER 13-05-00361-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


WHIRLPOOL CORPORATION, Appellant,


v.
 


MARGARITA CAMACHO AND 

SANTOS CAMACHO, INDIVIDUALLY 

AND ON BEHALF OF THE ESTATE OF 

JOAB CAMACHO, DECEASED, AND 

AS NEXT FRIEND OF ASAEL CAMACHO 

AND ABISAI CAMACHO, 

AND SALVADOR GONZALEZ, Appellees.

 


On appeal from the 370th District Court of Hidalgo County, Texas.


 


OPINION

Before Chief Justice Valdez and Justices Hinojosa (1) and Garza


Opinion by Chief Justice Valdez

 


 The underlying suit is a products liability design defect case arising out of a fire that
allegedly started in a Whirlpool dryer. The fire consumed a home and killed Joab
Camacho, a minor. Appellees, and plaintiffs in the court below, are Margarita, Joab's
mother; Santos, Joab's father; and Joab's brothers Salvador, Asael, and Abisai. (2) Appellant
Whirlpool Corp. ("Whirlpool") appeals from a judgment based on a jury verdict finding it one
hundred percent liable for Joab's death and assessing $14 million in damages. By five
issues, Whirlpool contends that (1) the evidence of a design defect is legally insufficient,
(2) the plaintiffs intentionally spoliated the fire scene, (3) the jury's finding of no contributory
negligence is legally and factually insufficient, (4) the damages awarded are not supported
by the evidence, and (5) appellee's counsel made improper jury arguments. We affirm.

I. BACKGROUND The Camachos' suit alleges that a defectively designed clothes dryer manufactured
by Whirlpool caused a fire that burned down their home and led to Joab's death. Before
the fire, the Camachos lived in a fourteen by sixty-five foot trailer home near Weslaco,
Texas. Joab's bedroom was on the eastern end of the home adjacent to the laundry room. 
Sometime during the early morning hours of February 11, 2003, a fire started in or
underneath the laundry room. The fire completely destroyed the Camachos' home and
killed Joab. Margarita and Santos Camacho, Joab's parents, and Asael, Abisai, and
Salvador, Joab's brothers, brought a defective design suit against Whirlpool. (3) 

 At trial, evidence was presented regarding: (1) events occurring before, during, and
after the fire; (2) the design, operation, and safety of the dryer; and (3) the nature and
quality of the relationships that individual members of the Camacho family had with Joab.

A. Events Surrounding the Fire

 Margarita Camacho testified at trial that on the evening of February 10, 2003, she
was washing and drying clothes, and that sometime late in the evening the dryer finished
drying a few t-shirts. Margarita opened the dryer door, sat in the living room, and dozed
off to sleep. She awoke to the smell of smoke and discovered flames coming from the
dryer, which was located along a hallway that led to Joab's bedroom. Margarita screamed
that the house was on fire in order to wake-up the rest of the family. Salvador, Joab's older
brother, woke up and helped get Asael and Abisai, Joab's younger brothers, out of the
home. Santos, Joab's father, tried to go to Joab's room, but could not proceed through the
hallway because of the strength of the flames coming from the dryer. Joab was the only
member of the Camacho family who did not escape.

 Salvador testified that he tried re-entering the home through the living room to
retrieve Joab, but the smoke was too intense and hot. He then went around the home on
the outside and tried to enter Joab's room through a window, but could not make it inside
because of the intense smoke and heat. Salvador called out to Joab and heard him asking
for help in a mumbling and tired fashion. Santos tried to enter Joab's bedroom window as
well, but he was nearly overcome by the smoke and heat. The Weslaco fire department
was called to the scene at 1:26 a.m. 

 Fire Marshal Arturo Gayton, Jr. arrived at the scene a few hours after the Weslaco
fire department was called. He was notified that there was a fatality and immediately
began an investigation. According to Gayton's testimony, a fire is first investigated for any
criminal activity. Gayton surveyed the home and found no signs of an accelerant. He
determined that the fire was accidental and originated in the laundry room based on
severity of damage to that portion of the home. 

B. The Camacho's Expert Testimony

 Ed Sanchez testified for the Camachos regarding the origin of the fire. Sanchez
began examining the Camacho property on February 12, 2003 and continued to investigate
the origin of the fire for several days. Sanchez thoroughly examined the Camachos' home
and property and catalogued the debris by saving it in bins and photographing the scene. 
Sanchez's investigation also included the use of dogs trained to sniff for accelerants. 

 Sanchez testified that the fire originated in the dryer. Sanchez based his testimony
on the amount and character of damage sustained to the laundry room as compared to the
remainder of the home. Sanchez testified that the portion of the home that sustains the
most damage is likely where the fire originates and that the laundry room sustained the
most damage. 

 He examined the wiring and flooring in the laundry room. The wiring did not show
signs of "arching," which would occur if there were an electrical short. Sanchez therefore
excluded an electrical short as the cause of the fire. The laundry room was heavily
damaged, except for a 2.5-by-2.5 foot square that was not burned. According to Sanchez's
testimony, the unburned square indicates that this area was protected from damage by the
dryer. Sanchez also opined that the relatively good condition of the square indicates that
the fire did not originate underneath the laundry room. 

 Sanchez's testimony also addressed the use of gas as a possible cause of the fire. 
Sanchez testified that trained dogs alerted to the presence of a gas tank in a car near the
Camacho home. Sanchez, however, believed that the tank's integrity had been
compromised by the fire, and he ruled out the use of an accelerant as a cause of the fire.

 Judd Clayton, an electrical engineer, also testified for the Camachos that the dryer
was the cause of the fire. Clayton examined the dryer that was used in the Camacho
home (the "incident dryer") as well as an exemplar model that was provided to him. He
noted that there were no electrical problems with the wiring going to the dryer. Clayton
testified that when wiring melts during an electrical fire, the electrical activity would create
"almost pinpoint damage," which was not present in the instant case. Clayton's testimony
regarding the fire's origin within the dryer relied in part on the Consumer Product Safety
Commission's Report on Lint Fires ("CPSC Report"). The trial court admitted the CPSC
Report over Whirlpool's objections. Clayton found burned lint in the exemplar dryer, which
he stated was a result of lint leaking out between the air chute and the blower housing. 

 According to Clayton, the Whirlpool dryer used by the Camachos leaked lint into the
machinery. Clayton testified that lint is combustible and that, if ignited, it could create an
ember that could travel into a load of laundry in the dryer drum. Clayton opined that the
corrugated tube used in the incident dryer traps lint. He claimed that Whirlpool could have
improved its dryer design by using a smooth tube, using better seals, and installing a
screen to trap lint in the dryer's machinery before lint could reach the heater box.

C. Whirlpool's Expert Testimony

 John Adams gave expert engineering testimony for Whirlpool. Adams testified that
he did not believe that the dryer caught on fire. He testified that when a dryer drum
catches on fire, it exhibits a "V" burn pattern on the outside and a horizontal line showing
where the fire pushed up to the top of the drum. Adams observed that the incident dryer
did not have the burn patterns that Adams believed are characteristic of a dryer drum fire. 
Adams also testified that the Camachos' lint ignition theory was not plausible as lint burns
very quickly and moves fast through the heating element. With regard to Clayton's
suggestion to place a screen in the dryer's machinery to catch lint before it enters the
heating element, Adams claimed such an alteration would cause lint to accumulate, and
the accumulated lint would either catch on fire or slow down the airflow within the dryer.

 Another Whirlpool expert witness was Roger Owens, a forensics and fire cause and
origin expert. Owens testified that he believed the cause of the fire was either electrical
or accelerant based. Owens testified that extension cords powered much of the home. 
He opined that the condition of the wires was bad and that the fire was started by an
electrical malfunction or an accelerant. 

 Whirlpool also presented testimony on its internal safety and quality control testing.

D. Jury Charge & Final Judgment

 The case was submitted to the jury on a products liability theory. The jury answered
"yes" to the question of whether Whirlpool defectively designed the Camachos' dryer. It
did not find any negligence on the part of Margarita, Santos, or Salvador and, therefore,
found that Whirlpool was one hundred percent responsible for Joab's death. The jury
awarded Margarita, Santos, and Salvador $3 million each in past and future damages. 
Asael and Abisai were each awarded $500,000 in past and future damages. Finally, the
jury awarded $4 million to Joab's estate for pain, suffering, mental anguish, and expenses. 
Whirlpool timely filed the instant appeal.

II. LEGAL SUFFICIENCY

 By its first issue, Whirlpool challenges the legal sufficiency of the jury's verdict on

the Camachos' design defect cause of action. Tex. R. App. P. 38.1(e) (providing that the
statement of an issue will be treated as covering every subsidiary question that is fairly
included). In five sub-issues, Whirlpool argues that (1) the Camachos' expert testimony
did not satisfy relevancy and reliability requirements; (2) the trial court committed reversible
error in admitting the CPSC Report; (3) the trial court erred in admitting the exemplar dryer
and related testimony because the usage history and condition of the exemplar bore no
relation to the incident dryer; (4) Whirlpool conclusively established that the plaintiff's
design defect theory is impossible; and (5) there is legally insufficient evidence of a safer
alternative design.

 Whilrpool's first three sub-issues deal with the admissibility of evidence. We will
discuss them first and individually. Then, we will address Whirlpool's fourth and fifth sub-issues by reviewing the legal sufficiency of the record with regard to the design defect
cause of action.

A. The Camachos' Expert Testimony

 Whirlpool's challenge to the Camachos' expert testimony is couched in both the
Robinson-factor analysis (4) and the "analytical gap" test. (5) Allstate Tex. Lloyds v. Mason, 123
S.W.3d 690, 697-98 (Tex. App.-Fort Worth 2003, no pet.) (noting that the supreme court
has crafted two tests to guide trial courts in accessing reliability). Although Whirlpool cites
Robinson numerous times, it devotes just over two pages of a fifty-page brief to the six
Robinson factors. Instead, it challenges Clayton's testimony as allegedly resting on
multiple untested assumptions. We therefore find that Whirlpool's argument primarily
relies on the analytical gap test. Gammill v. Jack Williams Chevrolet, 972 S.W.2d 713, 722
(Tex. 1998). We also find that the analytical gap test is the appropriate way to analyze the
Camachos' expert testimony because such testimony in the instant case is based on the
experience of the testifying experts. See Brandt v. Surber, 194 S.W.3d 108, 131 (Tex.
App.-Corpus Christi 2006, pet. denied).

1. Standard of Review

 We review the trial court's decision to admit or exclude expert evidence for an abuse
of discretion. State Farm Fire & Cas. Co. v. Rodriguez, 88 S.W.3d 313, 318 (Tex.
App.-San Antonio 2002, pet. denied); see Guadalupe-Blanco River Auth. v. Kraft, 77
S.W.3d 805, 810 (Tex. 2002). A trial court does not abuse its discretion merely because
a reviewing court in the same circumstances would have ruled differently. E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); Downer v. Aquamarine
Operations, Inc., 701 S.W.2d 238, 242 (Tex. 1985). The trial court abuses its discretion
if its decision was arbitrary or unreasonable without regard to guiding rules and principles. 
Downer, 701 S.W.2d at 241-42. 

 We will reverse based on the erroneous admission or exclusion of evidence only
if the appellant shows error that was calculated to cause, and probably did cause, the
rendition of an improper judgment. Tex. R. App. P. 44.1(a); City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995); Doncaster v. Hernaiz, 161 S.W.3d 594, 601 (Tex.
App.-San Antonio 2005, no pet.) ("[E]rror on questions of evidence is generally not
reversible unless the appellant can show that the whole case turns on the particular
evidence admitted or excluded.").

2. Applicable Law

 Expert testimony must be relevant to the issues in a case and be based on a reliable
foundation. Tex. R. Evid. 702; Robinson, 923 S.W.2d at 553. The trial court must make
an initial determination of whether the expert's testimony is relevant and reliable so as to
be admissible. Robinson, 923 S.W.2d at 557; Gross v. Burt, 149 S.W.3d 213, 237 (Tex.
App.-Fort Worth 2004, pet. denied) (op. on reh'g). Scientific expert testimony is reliable
if it is "grounded 'in the methods and procedures of science' [otherwise it] is no more than
'subjective belief or unsupported speculation.'" Robinson, 923 S.W.2d at 557 (quoting
Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 590 (1993)). 

 The Texas Supreme Court has recognized that "[e]xperience alone may provide a
sufficient basis for an expert's testimony" unless there is "too great an analytical gap
between the data and the opinion proffered." Gammill, 972 S.W.2d at 726-27; see Mack
Trucks v. Tamez, 206 S.W.3d 572, 579 (Tex. 2006) ("We recognized [in Gammill] that the
criteria for assessing reliability must vary depending on the nature of the evidence."). An
impermissible analytical gap exists if an expert "has offered nothing to suggest that what
he believes could have happened actually did happen," because in that case "[h]is
opinions are little more than 'subjective belief or unsupported speculation.'" Gammill, 972
S.W.2d at 727-28 (citing Robinson, 923 S.W.2d at 557). The critical inquiry is whether
there is an "analytical gap" between the opinion and the basis on which it is founded. Id.
at 726. The proponent of the expert testimony bears the burden of demonstrating that its
expert is qualified under Rule 702. Robinson, 923 S.W.2d at 557. 

2. Analysis

 Whirlpool argues that Clayton's testimony regarding how the fire originated in the
dryer is unreliable. (6) Clayton holds a bachelor's of science degree in engineering and has
worked in the field of engineering consulting since 1977. He has professional engineering
experience in ensuring facilities are compliant with the Occupational Safety and Hazards
Act. He has also received training in fire cause and origin. Of the approximately 2,800
fires Clayton has investigated, he has inspected hundreds of dryers that were suspected
of starting on fire. 

 Clayton's in-court testimony was based on his experience, review of relevant
literature, and his examination of the incident dryer and an exemplar dryer, which was the
same make and model as the one used by the Camachos. Clayton examined the wiring
going to the dryer and the wiring in the dryer. He did not find any indication that the fire's
origin was electrical. Instead, Clayton's professional opinion was that the fire originated
in the dryer. He posited that lint from the dryer ignited, creating embers that entered the
dryer drum; this ignited the load of laundry and led to the fire escaping from the dryer drum. 
Whirlpool attacks these three statements by calling them premises that do not withstand
Daubert/Robinson scrutiny. Brief of Appellant at 16, Whirlpool Corp. v. Margarita
Camacho, et al., No. 13-05-361-CV (Tex. App.-Corpus Christi, Feb. 17, 2006). It contends
that these are three distinct theories and implicitly argues that each individual theory must
be supported by its own set of independent objective evidence. But see Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983) ("Although no witness could conclusively
state that the product was the cause, the jury could have made that determination from
circumstantial evidence").

 Clayton's testimony regarding the presence of lint and its possible ignition is
supported by an examination of the exemplar dryer, which revealed lint in the dryer
cabinet. (7) Clayton noticed that the corrugated air transport tube (the "corrugated tube")
used in the Camacho dryer caused lint to become trapped in the tube, interfere with the
dryer's airflow, and thereby allow lint to escape from the tube into the dryer cabinet. He
posited that a smooth air transport tube would not allow lint to become trapped in the same
manner as the corrugated tube. Moreover, Clayton's examination of the incident dryer
revealed burnt lint underneath the heating element. Clayton's lint ignition testimony is
based on an objective observation of lint build-up in the dryer cabinet.

 Independent observations supported Clayton's testimony regarding how an ember
survived to ignite the clothes in the dryer and then spread from the dryer. Admitted into
evidence were partially charred t-shirts that were in the dryer. Alcohol, Tobacco, and
Firearms Special Agent Kevin Savage concluded in a report that "[t]here was severe
damage to the interior of the [dryer] and the interior of the drum." Sanchez testified that
the damage to the laundry room showed that the fire could not have started beneath the
dryer, because a 2.5-by-2.5 foot square where the dryer sat was undamaged. Sanchez
opined that the dryer protected the surface that it sat on as the fire spread from it. 
Additionally, Sanchez concluded that the fire could not have started underneath the home
because fire burns in an upward direction and so a fire starting underneath the home would
have damaged the portion of the floor where the dryer sat. 

 Clayton and Sanchez relied on objective criteria in the record and their own
experience to conclude that the dryer caused the fire. While Whirlpool may disagree with
their conclusions, the experts explained the basis for their opinions and based those
opinions on objective facts. We therefore hold that the trial court did not abuse its
discretion in admitting the expert testimony of Clayton and Sanchez. See Downer, 701
S.W.2d at 241-42. Whirlpool's first sub-issue is overruled.

B. Admission of the CPSC Report

 By its second sub-issue, Whirlpool contends that the trial court erred in admitting
the CPSC Report because the report was irrelevant and highly prejudicial. As noted supra,
we review a trial court's decision to admit evidence under an abuse of discretion standard. 
Rodriguez, 88 S.W.3d at 318. Relevant evidence is evidence having any tendency to
make the existence of any fact of consequence to the determination of the action more
probable or less than it would be without the evidence. Tex. R. Evid. 401. To be relevant,
in other words, the proposed testimony must be sufficiently tied to the facts of the case that
it will aid the jury in resolving a factual dispute. Gammill, 972 S.W.2d at 720.

 Whirlpool argues that the CPSC Report was inadmissible because the testing
performed therein was highly technical and did not focus on real-world function. 
Additionally, Whirlpool argues that the report's statement that "[t]his report should not be
used to suggest that current clothes dryers are unsafe or defective," necessitated its
exclusion from evidence. 

 We disagree with Whirlpool's contention that the report was irrelevant. It contains
diagrams of how air flows through a dryer model similar to the incident dryer, how lint
accumulates on various parts of the dryer, and how lint can start on fire while passing over
the heating element. The evidence appears relevant and does not appear to be unduly
prejudicial. The statement that Whirlpool so ardently complains of was evidence for the
jury to consider along with all the other evidence. No abuse of discretion is found with the
admission of the CPSC Report. Whirlpool's second sub-issue is overruled.

C. Admission of the Exemplar Dryer

 By its third sub-issue, Whirlpool argues that the trial court abused its discretion in
admitting the exemplar dryer because it was not used in a similar manner as the incident
dryer. Whirlpool argues that the Camacho dryer was infrequently used and properly
vented. In contrast, the exemplar model was frequently used and not properly vented. 

 "[E]vidence of other accidents involving the same product is generally admissible
to show its dangerous or hazardous nature, if the accidents occurred under the same or
substantially similar conditions as that involving the plaintiff, and with reasonable proximity
in time." Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 340-41 (Tex. 1998). 
Whirlpool urges us to focus the substantially similar analysis on the external conditions
brought to bear upon the dryer. However, the substantially similar test allows the
admission of other incidents that must have occurred under reasonably similar (though not
necessarily identical) conditions. Id. at 341. The substantially similar condition is the
mechanical inner workings of the dryer. Clayton's testimony was that the corrugated tube
and lack of a screen were what led to lint leakage, not the frequency and ventilation of the
dryer. Whirlpool did not present any evidence that the exemplar dryer's air transport tube
or heating element were substantially different than the incident dryer's parts. 

 We hold that the trial court did not abuse its discretion in admitting the exemplar
dryer. Whirlpool's third sub-issue is overruled. (8)

D. Conclusiveness of Whirlpool's Evidence

 By its fourth sub-issue, Whirlpool argues that it conclusively disproved the plaintiff's
theory that the dryer was the cause of the fire. It argues that its expert testimony
conclusively establishes the opposite of a vital fact. Brief of Appellant at 24-25; 27-28;
see City of Keller v. Wilson, 168 S.W3d 802, 810 (Tex. 2005).

1. Standard of Review

 In conducting a legal sufficiency review, we credit evidence supporting the judgment
if reasonable jurors could and disregard contrary evidence unless reasonable jurors could
not. City of Keller, 168 S.W.3d at 827. We will sustain a legal sufficiency, or no-evidence,
point if the record reveals one of the following: (1) the complete absence of a vital fact; (2)
the court is barred by rules of law or of evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than
a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. See
Martinez, 977 S.W.2d 328 at 334. If more than a scintilla of evidence exists, it is legally
sufficient. Lee Lewis Constr. Co. v. Harrison, 70 S.W.3d 778, 782 (Tex. 2001). More than
a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about a vital fact's existence. Id. at 782-83.

2. Analysis

 Whirlpool argues that Adams's testimony conclusively disproved the plaintiff's theory
that the fire originated in the dryer. Adams testified that the dryer would not have enough
suction power to draw lint from the lint chute into the heater box. Adams also testified that
when lint is intentionally thrown onto the heating element, it travels so quickly that it is
impossible to ignite. Adams's testimony was buttressed by videotaped testing conduct by
Whirlpool. Additionally, Whirlpool directs us to (1) the fact that the shirts inside the dryer
drum were not totally consumed by the fire and (2) Adams's expert testimony that the burn
patterns were not consistent with the fire starting in the dryer drum and then spreading out.

 While Whirlpool's expert testimony may be plausible, it is not conclusive.
Photographs were admitted into evidence showing what Clayton claimed was charred lint
inside the heating element of the exemplar dryer. This evidence contradicts Adams's
testimony that lint could not be pulled into the heating element and charred. Sanchez
testified that the shirts were not consumed by the fire because of the "phonebook effect,"
whereby a fire burns the outside of some object but does not burn the inside because there
is not enough oxygen on the inside of the object. Sanchez also testified that the condition
of the laundry room, including its floor, is consistent with the fire starting in the dryer. 
Moreover, Margarita testified that she saw flames coming from the dryer.

 Whirlpool, thus, has not shown that it conclusively disproved the Camacho's
theories. Whirlpool's fourth sub-issue is overruled.

E. The Camachos' Evidence of a Safer Alternative Design

 Whirlpool's fifth and final sub-issue is that there was legally insufficient evidence of
a safer alternative design. In addition to proving that a product is unreasonably dangerous,
a plaintiff must prove that (1) there was a safer alternative design, (2) the safer alternative
design would have prevented or significantly reduced the risk of injury without substantially
impairing the product's utility, and (3) the safer alternative design was both technologically
and economically feasible when it left the manufacturer's control. Tex. Civ. Prac. & Rem.
Code Ann. § 82.005(a)-(b) (Vernon 2005); Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584,
588 (Tex. 1999). To establish the existence of a safer alternative design, a plaintiff must
show that the alternative design would not, under other circumstances, impose an equal
or greater risk of harm. Martinez, 977 S.W.2d at 337. The safety benefits from the
proposed design must be "foreseeably greater than the resulting costs, including any
diminished usefulness or diminished safety." Id.; Costilla v. Crown Equip. Corp., 148
S.W.3d 736, 739 (Tex. App.-Dallas 2004, no pet.).

 Whirlpool argues that Clayton's testimony alone cannot prove the existence of a
safer alternative design. See Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999) ("An
expert's simple ipse dixit is insufficient to establish a matter; rather, the expert must explain
the basis of his statements to link his conclusions to the facts."); Gammill, 972 S.W.2d at
726-27; see Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 95 F.3d 1320, 232
(Tex. 2004). 

 Clayton, the Camachos' expert, opined that Whirlpool could have improved the
design of its dryer by (1) strengthening the connection to the air transport tube, (2)
changing from a corrugated air transport tube to a smooth tube, and (3) installing a filter
in the dryer cabinet to prevent lint from leaking into the heating element. Furthermore,
Clayton testified that smooth tubes had previously been used in Whirlpool dryers and were
being used by Westinghouse, a competitor, in its dryers. He also testified that the use of
a smooth tube coupled with a stronger connection would reduce the risk of lint escape. 
See Martinez, 977 S.W.2d at 337 (providing that to establish a safer alternative design, a
plaintiff must show that the alternative design would not, under other circumstances,
impose an equal or greater risk of harm).

 Adams, Whirlpool's expert, testified that Whirlpool had used a smooth air transport
tube in previous models, but that the smooth tube was prone to detaching, which could
cause lint to escape. Adams opined that the corrugated tube was a safer alternative
because it was less prone to detach. Adams also testified that installing a screen to
prevent lint from entering the heating element was a "bad idea" because it could create a
patch of lint near the heating element that was susceptible to combustion. 

 Based on the forgoing, we conclude that Clayton's testimony sufficiently linked his
conclusions to the facts of the instant case and that there is at least some evidence - more
than a scintilla - of the existence of a safer alternative design. Ratliff, 998 S.W.2d at 890. 
We overrule Whirlpool's fifth sub-issue. 

 Having determined that the evidence is legally sufficient to support the jury's findings
that the Whirlpool dryer was defectively designed and that a safer alternative design
existed, we overrule Whirlpool's first issue.

III. SPOLIATION

 By its second issue, Whirlpool contends that the Camachos intentionally spoliated
the scene and that the trial court erred by not dismissing the suit or not including a
spoliation instruction. Whirlpool alleges that the Camachos did not photograph obviously
critical areas until after they removed all the fire debris.

 Spoliation is the improper destruction of evidence, proof of which may give rise to
a presumption that the missing evidence would be unfavorable to the spoliator. Brumfield
v. Exxon Corp., 63 S.W.3d 912, 919 n.3, 920 (Tex. App.-Houston [14th Dist.] 2002, pet.
denied). Trial courts have broad discretion in taking measures to address spoliation of
evidence. See Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721 (Tex. 2003);
Trevino v. Ortega, 969 S.W.2d 950, 953 (Tex. 1998). A trial court abuses its discretion by
acting arbitrarily, unreasonably, or without consideration of guiding principles. Downer, 701
S.W.2d at 241-42. A trial court generally does not abuse its discretion when it bases its
decision on conflicting evidence. Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978).

 To raise the spoliation issue, the party seeking the presumption bears the burden
of establishing that the alleged spoliator had a duty to preserve the evidence in question.
Johnson, 106 S.W.3d at 722. This duty to preserve evidence arises when a party knows
or reasonably should know (1) that there is a substantial chance that a claim will be filed,
and (2) that evidence in its possession or control will be material and relevant to that claim. 
Id. A trial court may be guided by the following three factors in determining whether
sanctions or a spoliation presumption are justified: (1) whether there was a duty to
preserve evidence; (2) whether the alleged spoliator either negligently or intentionally
spoliated evidence; and (3) whether the spoliation prejudiced the nonspoliator's ability to
present its case or defense. Treviño, 969 S.W.2d at 954-55 (Baker, J., concurring). 

 Assuming that there was a duty to preserve the evidence, the record reveals that
the Camachos preserved the scene as practicably as possible. The record contains
numerous photographs, notes, and diagrams of the scene. Moreover, the scene was
initially altered not by the Camachos, but by the fire department in its suppression and
investigation efforts. With regard to the third Treviño factor, we find that Whirlpool was
able to marshal the services of several experts to rebut the Camachos' expert testimony. 

 We hold that the trial court did not abuse its discretion by not dismissing the suit or
including a spoliation instruction. Whirlpool's second issue is overruled.

IV. SUFFICIENCY OF THE EVIDENCE CHALLENGE TO CONTRIBUTORY
NEGLIGENCE CLAIM


 By the title of its third issue, Whirlpool argues that the jury's answers to questions
two and three of the jury charge are against the great weight and preponderance of the
evidence. (9) Question two asked the jury whether the negligence of Margarita, Santos, or
Salvador proximately caused Joab's death. The jury responded with a "no" answer as to
each family member. Question three asked the jury to apportion responsibility for Joab's
death as between Whirlpool and the three aforementioned members of the Camacho
family. The jury answered that Whirlpool was "100%" responsible.

 In conducting our factual sufficiency review, we are mindful that the jury is the sole
judge of the credibility of witnesses and the weight to be given to their testimony, and we
may not substitute our judgment for that of the jury. See Golden Eagle Archery, Inc. v.
Jackson, 116 S.W.3d 757, 761 (Tex. 2003); Maritime Overseas Corp. v. Ellis, 971 S.W.2d
402, 407 (Tex. 1998). We set aside a finding for factual insufficiency only if it is so contrary
to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). 

 Whirlpool claims that the Camachos were negligent by not having smoke detectors
in the home and by using a piece of plywood to cover a window in Joab's bedroom. 
Whirlpool's evidence of contributory negligence was, however, highly controverted. Fire
Marshal Gayton testified that, on the night of the fire, Salvador told him that Joab's window
was boarded up. At trial, however, Salvador testified that the window was not boarded up. 
Additionally, Margarita testified that she saw Salvador take the piece of plywood off of the
window before he went to sleep. Regarding the lack of a smoke detector, Gayton testified
that many homes in the area did not have one.

 The jury, as the sole judge of the credibility of witnesses and the weight to be given
to their testimony, was free to believe Salvador and Margarita. We do not find the jury's
answers to the contributory negligence questions so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust. Cain, 709 S.W.2d at 176. 

 Even if evidence was not conflicting, the acts alleged do not constitute negligence
because they merely furnished a condition which made injury possible. See, e.g., IHS
Cedars Treatment Ctr. of Desoto, Texas, Inc. v. Mason, 143 S.W.3d 794, 799 (Tex. 2004)
("cause in fact [for negligence purposes] is not established where the defendant's negligence does no more than furnish a condition which makes the injuries possible."). 
Whirlpool's third issue is overruled.

V. LEGAL AND FACTUAL SUFFICIENCY OF THE DAMAGES

 By its fourth issue, Whirlpool challenges the legal and factual sufficiency of the
evidence supporting the award of damages to all of the Camachos, including Joab's estate.

A. Standard of Review (10)

 The standard of review for an excessive damages complaint is factual sufficiency
of the evidence. See Rose v. Doctors Hosp., 801 S.W.2d 841, 847-48 (Tex. 1990); Pope
v. Moore, 711 S.W.2d 622, 624 (Tex. 1986). We should employ the same test for
determining excessive damages as for any factual sufficiency question. See Pope, 711
S.W.2d at 624. When considering a factual sufficiency challenge to a jury's verdict, we
must consider and weigh all of the evidence, not just that evidence which supports the
verdict. See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Lofton v. Texas Brine Corp.,
720 S.W.2d 804, 805 (Tex. 1986). A court of appeals can set aside the verdict only if it is
so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and
unjust. See Ortiz, 917 S.W.2d at 772; Cain, 709 S.W.2d at 176. We, however, are not a
fact finder. Accordingly, we may not pass upon the witnesses' credibility or substitute our
judgment for that of the jury, even if the evidence would clearly support a different result. 
See Pool v. Ford Motor Co., 715 S.W.2d 629, 634 (Tex. 1986).

 If we determined that the evidence supports the jury's verdict, we are not required
to detail all the evidence supporting the judgment when we affirm the trial court's judgment
for actual damages. See Ellis County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex.
1994). On the other hand, when reversing a trial court's judgment for factual insufficiency,
we must detail all the evidence relevant to the issue, clearly state why the jury's finding is
factually insufficient or so against the great weight and preponderance of the evidence that
it is manifestly unjust, and explain how the contrary evidence greatly outweighs the
evidence supporting the verdict. See Keever, 888 S.W.2d at 794; Pool, 715 S.W.2d at
635. 

B. Damages Awarded to Santos and Margarita Camacho

 The jury was instructed that it could award Santos and Margarita damages for the
elements of (1) loss of companionship and society, and (2) mental anguish. The
instruction asked the jury to consider an award of damages for each element as separate
by stating that the jury was "not to include damages for the other [element]." Moore v.
Lillebo, 722 S.W.2d 683, 688 (Tex. 1986) (providing that "[t]he trier of fact should . . . be
instructed that mental anguish and loss of society and companionship are separate
elements of recovery" and that "damages should not overlap, and no double recovery
should be allowed."). The answer section, however, did not delineate the amount for each
element but provided only for the recovery of past and future damages. No objection to
the broad form question was raised. The jury awarded Santos and Margarita $3 million
each for past and future damages for loss of companionship and society and mental
anguish. 

 Because no objection to the broad form of the question was raised, "we look only
to see if one of the grounds submitted to the jury is a valid ground. . . ." In re A.V., 113
S.W.3d 355, 363 (Tex. 2003); see also Greater Houston Transp., Inc. v. Zrubeck, 850
S.W.2d 579, 589 (Tex. App.-Corpus Christi 1993, writ denied) ("If there is just one element
that is supported by the evidence, the damages award will be affirmed if it is supported by
the evidence."). 

 We begin with the element of loss of companionship and society, which is described
as a loss of the positive benefits that a claimant would have received from a loved one
such as love, comfort, and companionship. Moore v. Lillebo, 722 S.W.2d 683, 687-88
(Tex. 1986); Guzman v. Guajardo, 761 S.W.2d 506, 510 (Tex. App.-Corpus Christi 1988,
writ denied). Margarita testified that Joab was a good student. He enjoyed attending
church and his father's prayer services. Joab mowed elderly peoples' yards for free and
donated some of his toys to less fortunate children. Santos testified that he had a good,
close relationship with Joab and that Joab was a friend. By all accounts, Joab was an
exceptional individual. Both Margarita and Santos presented testimony on the positive
benefits that Joab brought to their lives. There was no contradictory evidence presented
about the nature and quality of the relationship that Margarita and Santos had with Joab.

 We conclude that the evidence taken as a whole is both legally and factually
sufficient to support the damages awarded by the jury for loss of companionship and
society. The record contains more than a scintilla of evidence to support the findings on
damages and none are so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. Catalina v. Blasdel, 881 S.W.2d 295, 297(Tex. 1994); Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986). Whirlpool's challenges to the sufficiency of the
evidence for the damages awarded to Santos and Margarita are overruled.

C. Damages awarded to Salvador, Asael, and Abisai

 In questions six, seven, and eight, the jury was asked what amount of money would
compensate Salvador, Asael, and Abisai for the mental anguish that they suffered as a
result of being bystanders to Joab's death. The jury awarded Salvador $3 million and
awarded Asael and Abisai $500,000 each. Whirlpool challenges the sufficiency of the
evidence supporting the jury's award of damages to Joab's brothers. Specifically,
Whirlpool challenges the sufficiency of the evidence supporting Salvador and Asael's
mental anguish and the sufficiency of the evidence supporting Abisai's ability to recover
as a bystander.

 The supreme court has held that mental anguish damages could not be awarded
without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish,
thus establishing a substantial disruption in the plaintiffs' daily routine", or other evidence
of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety,
vexation, embarrassment, or anger.'" Parkway Co. v. Woodruff, 901 S.W.2d 434, 444
(Tex. 1995).

 Whirlpool argues that Salvador did not present enough evidence of mental anguish
to justify the award. Salvador testified that he was actively involved in the rescue efforts. 
During that time, he heard Joab calling out. Salvador testified, "[h]e was - he was kind of,
like, mumbling, like he was real tired, for me to help him." Salvador's testimony about how
he heard his brother moments before his death speaks directly to the nature of his distress. 
Additionally, Margarita testified that Salvador visits Joab's grave every chance he gets and
that he often does not come home until late. Margarita's testimony touches upon the
disruption to Salvador's life - frequent visits to the gravesite of a younger brother. 
Whirlpool's challenge to the sufficiency of the mental anguish element as it pertains to
Salvador is overruled.

 As part of its fourth issue, Whirlpool challenges the sufficiency of the evidence
supporting Abisai's ability to recover as a bystander. To recover as a bystander, a plaintiff
is required to establish that the plaintiff: (1) was located near the scene of the accident,
as contrasted with one who was a distance away from it; (2) suffered shock as a result of
a direct emotional impact upon the plaintiff from a sensory and contemporaneous
observance of the accident, as contrasted with learning of the accident from others after
its occurrence; and (3) and the victim were closely related, as contrasted with an absence
of any relationship or the presence of only a distant relationship. Freeman v. City of
Pasadena, 744 S.W.2d 923, 923-24 (Tex. 1988). 

 Salvador testified that Asael attempted to help in the rescue efforts but was
thwarted. Moreover, Margarita testified that the family was asleep when the fire started
and that she woke the family up and attempted to get everyone out of the home. Salvador
and Margarita's testimony establish that there is some evidence that Asael and Abisai were
near the fire scene. Therefore, Whirlpool's challenge to the sufficiency of the evidence
supporting Abisai's ability to recover as a bystander is overruled. 

 Additionally, Salvador testified that Asael and Abisai acted too aggressive and "as
if they are angry." Margarita testified that Asael and Abisai had been "affected a lot" and
were "doing badly at school." We hold that the record contains some evidence showing
that Asael and Abisai suffered a high degree of mental pain and distress that is more than
mere worry, anxiety, vexation, embarrassment, or anger. See Woodruff, 901 S.W.2d at
444. Whirlpool's challenge to the sufficiency of the evidence underlying the jury's award
of damages to Asael and Abisai is overruled.

D. Damages to Joab's Estate

 In question nine the jury was asked what amount of money would compensate Joab
for pain and mental anguish. The jury awarded Joab's estate $4 million. Whirlpool
challenges the sufficiency of the evidence supporting the jury's answer to question nine. 
Whirlpool argues that "Joab died from smoke inhalation, lost consciousness before the fire
reached him, and likely felt no pain." Brief of Appellant at 48. We disagree.

 Salvador testified that he heard Joab call out for help. Additionally, Fire Marshal
Gayton testified that smoke is a toxic gas that burns the lungs. The autopsy revealed
smoke in Joab's lungs and heart. We hold that there is sufficient evidence to support the
jury's award. Whirlpool's fourth issue is overruled.

VI. IMPROPER ARGUMENT

 By its fifth and final issue, Whirlpool argues that the Camachos' attorney repeatedly
sought to inflame the jury's passions and prejudices. Whirlpool cites us to five instances
where the Camacho's attorney allegedly made inappropriate comments by: (1) accusing
Whirlpool of "blaming the victims" in response to Whirlpool's contributory negligence
defense; (2) implying that Whirlpool did not have a right to present a defense by accusing
Whirlpool of refusing to take responsibility for its products; (3) asking if it should be "open
season" on people who use extension cords; (4) referring to Whirlpool's suggestion that
the fire was caused by a fire bomb thrown under the mobile home by a terrorist or gang;
and (5) referring to the "Easy Clean 100" as the "Easy Burn 100" and claiming that the
CPSC's disclaimer was the result of people in the dryer industry "try[ing] to cover their
butts."

 The test for improper jury argument is whether the argument could have persuaded
a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have
agreed but for the argument. See Welch v. McLean, 191 S.W.3d 147, 161 (Tex. App.-Fort
Worth 2005, no pet.). Reversal is required only when the entire record shows that
argument was improper, uninvited and unprovoked, preserved by a timely objection, and
incurable by instruction, withdrawal, or trial court reprimand. See Standard Fire Ins. Co.
v. Reese, 584 S.W.2d 835, 839 (Tex. 1979); Welch, 191 S.W.3d at 161. Further, an
appellant must show that the argument constituted harmful error by its nature, degree, and
extent. Standard Fire, 584 S.W.2d at 839. 

 The Camachos note that Whirlpool's brief never cites the aforementioned test and
"never makes any attempt to apply it to the complaints it raises." Brief of Appellees at
46, Whirlpool Corp. v. Margarita Camacho, et al., No. 13-05-361-CV (Tex. App.-Corpus
Christi, Jun. 2, 2006). Indeed, Whirlpool's briefing on the issue consists of two pages, half
of which contains single-spaced quotations from the record. The "argument section"
consists, in its entirety, of the following:

The trial court overruled Whirlpool's timely objections and made no attempt
to cure the prejudice. [Record citations omitted]. Its apparent stamp of
approval allowed the jury to disregard Whirlpool's scientific evidence in favor
of Plaintiffs' demonstrably impossible explanation for the fire.


Attorneys must confine their arguments to the evidence and the argument of
opposing counsel. Lone Star Ford, Inc. v. Carter, 848 S.W.2d 850, 853 (Tex.
App.- Houston [14th Dist. 1993, no writ). Inflammatory appeals to passion
and prejudice are improper. Circle Y of Yoakum v. Blevins, 826 S.W.2d 753,
758 (Tex. App.- Texarkana 1992, writ denied). Improper comments are
more likely harmful when repeatedly made. Standard Fire Ins. Co. v. Reese,
584 S.W.2d 835, 840 (Tex. 1979); Nat'l Union Fire Ins. Co. v. Kwiatkowski,
915 S.W.2d 662, 665 (Tex. App.- Houston [14 Dist.] 1996, no writ). And
because a jury is predisposed to believe that a trial court's ruling are correct,
the trial court's refusal to sustain Whirlpool's objections added weight to the
improper argument. Blevins, 826 S.W.2d at 759; see also Davis v. Southern
Pac. Transp. Co., 585 S.W.2d 801, 804 (Tex. Civ. App.- Houston [1 Dist.]
1979, no writ). The cumulative effect of the improper argument and the trial
court's inaction requires a new trial.


Brief of Appellant at 49-50.

 Whirlpool has failed to show us how the statements it challenges could have
persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he
would have agreed but for the argument. McLean, 191 S.W.3d at 161. Whirlpool's fifth
issue is overruled.

 VII. CONCLUSION

 The trial court's judgment is affirmed.


 _______________________

 ROGELIO VALDEZ,

 Chief Justice


Opinion delivered and filed 

this the 17th day of January, 2008.

 
1. Justice Federico G. Hinojosa, Jr., whose term ended on December 31, 2006, did not participate.
2. For ease of reference, the parties last names will be omitted.
3. Margarita and Santos sued in their individual capacity and as representatives of Joab's estate.
4. The Robinson-factor analysis is a non-exclusive list of six factors for determining the reliability of
expert testimony. It includes: (1) the extent to which the theory has been or can be tested; (2) the extent to
which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been
subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the
underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
(6) the non-judicial uses which have been made of the theory or technique. E.I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).
5. The Texas Supreme Court has also recognized that "there are many instances when the relevance
and reliability of an expert witness's testimony are shown by the witness's skill and experience." Gammill v.
Jack Williams Chevrolet, 972 S.W.2d 713, 722 (Tex. 1998). 
6. The bulk of Whirlpool's expert testimony challenge is lodged against Clayton. Whirlpool, however,
makes a passing reference against the reliability of Sanchez's testimony. Brief of Appellant at 32, Whirlpool
Corp. v. Margarita Camacho, et al., No. 13-05-361-CV (Tex. App.-Corpus Christi, Feb. 17, 2006) ("Neither
Clayton nor Sanchez presented or authored a published article, much less a peer-reviewed article about the
opinions they rendered in this case."). Out of an abundance of caution, we will discuss the reliability of
Sanchez's testimony where appropriate. Tex. R. App. P. 38.9.
7. Whirlpool's third sub-issue challenges the admission of the exemplar dryer. We discuss this sub-issue in subsection c.
8. The legal sufficiency of the evidence as it relates to the exemplar dryer will be discussed in
subsection e.
9. Whirlpool advances its third issue without a single citation to any legal authority. See Tex. R. App.
P. 38.1(h) (providing that the brief must contain a clear and concise argument for the contentions made, with
appropriate citations to authorities and the record). Out of an abundance of caution, we construe the issue
as a challenge to the factual sufficiency of the evidence supporting the jury's answer to the contributory
negligence questions. Tex. R. App. P. 38.9.
10. We have already detailed the legal sufficiency standard of review and will employ it when necessary.
 Tex. R. App. P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as
practicable but that addresses every issue raised and necessary to final disposition of the appeal).