TEXAS ELECTRIC COOPERATIVE and Stephen Paul Bumstead, Appellants,

v.

Mary R. DILLARD, Individually and as Community Survivor of the Estate of Kenneth Lewis Dillard, Deceased, and Mary R. Dillard, a/n/f for Kimberly Dillard, A Minor, Appellees.

No. 12-01-00258-CV.

Court of Appeals of Texas, Tyler.

July 20, 2005.

**2.** As our holding related to TEC's first issue is dispositive of the case as a whole, we do not reach TEC's remaining issues.

Glenn A. Sodd, R. Matt Dawson, Dawson & Sodd, P.C., Corsicana, for Appellees.

Panel consisted of WORTHEN, C.J., GRIFFITH, J. and DeVASTO, J.

## OPINION

JAMES T. WORTHEN, Chief Justice.

Texas Electric Cooperative ("TEC") and Stephen Bumstead appeal a judgment for damages awarded to Mary Dillard following a jury trial. TEC and Bumstead raise three issues on appeal. We affirm.

### BACKGROUND

On May 27, 1996, Bumstead was driving a TEC tractor-trailer rig loaded with utility poles from Jasper, Texas to Muenster, Texas. At approximately 10:00 p.m., while traveling westbound on two-lane U.S. Highway 175, Bumstead crested a hill overlooking the Neches River bridge.[1] As he crested the hill, Bumstead saw eight or nine cows wandering about on the highway between his truck and the bridge. Bumstead's truck collided with one of the cows, which fell dead in the eastbound lane about two hundred fifty feet from the bridge. Bumstead had difficulty maintaining control of his tractor-trailer after the collision, but was able to cross the bridge and stop the truck about three-tenths of a mile (1,584 feet) beyond where the dead cow lay.

Bumstead immediately radioed the driver of an approaching eastbound Arkansas Freightways tractor-trailer to warn him of the dead cow in the roadway. Bumstead also requested that the trucker, who had a cell phone, contact 9-1-1 to report the accident. The Arkansas Freightways truck avoided the carcass in the road and

D. Bradley Dickinson, Michael V. Winchester, Michael V. Winchester & Associates, P.C., Plano, for Appellants.

1. The bridge is approximately 2,000 feet from the crest of the hill.

continued eastbound towards Cuney, Texas.

Minutes later, May Joyce Brown, who was traveling eastbound on U.S. 175, unwittingly drove past Bumstead's unilluminated rig and across the bridge. According to Brown, as she crossed the bridge, she was traveling between thirty-five and forty miles per hour. After crossing the bridge, she came upon the cow carcass in her lane. Brown stated that she did not have time to apply her brakes before her car struck the cow carcass and vaulted into the westbound lane. Still airborne, Brown's car struck the Dillards' vehicle, killing Kenneth Dillard and injuring his wife, Mary, and daughter, Kimberly.

Mary Dillard filed suit against TEC and Bumstead both in her capacity as community survivor of Kenneth Dillard and as next friend of their minor daughter. The matter proceeded to jury trial. Ultimately, the trial court entered a judgment that TEC's and Bumstead's negligence caused the death of Kenneth Dillard and the injuries of Mary and Kimberly Dillard and awarded damages. This appeal followed.[2]

### EXPERT TESTIMONY

In their second issue, TEC and Bumstead contend that the trial court erred in refusing to permit Department of Public Safety ("DPS") Officer Cleland to testify as an expert witness concerning Bumstead's ability to avoid hitting the cow. The pertinent testimony is as follows:[3]

Q. All right. Is there any way for you, as we sit here today, to determine, given the truck being driven by Mr. Bumstead traveling fifty miles an hour with an eighty-thousand-pound load, whether or not he would have had time to stop or avoid the cows once he saw them the night of the accident?

A. No, I wouldn't say that. There are two factors involved here. One is that the cow was dark in their color and low beam headlights, or even high beam headlights probably have about three hundred feet ahead of you. A person still has to interpret what they're seeing, along with reaction time, **and so absolutely not. I don't think he could have avoided it.**

The decision whether to admit evidence rests within the discretion of the trial court. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). A two-part test governs the admissibility of expert testimony: (1) the expert must be qualified and (2) the testimony must be relevant and be based on a reliable foundation. *See Helena Chemical Company v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). To be relevant, the proposed testimony must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Robinson*, 923 S.W.2d at 556; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (when the factual basis of testimony is sufficiently called into question, the trial judge must determine whether the testimony has a reliable basis and is therefore admissible). If an expert relies upon unreliable foundational data, any opinion drawn from that

---

**2.** The Texas Supreme Court in *Dillard v. Texas Electric Co-op.*, 157 S.W.3d 429 (Tex.2005) held that TEC and Bumstead were not entitled to a sole proximate cause jury instruction in addition to an unavoidable accident instruction. The matter was thus remanded to this court to consider the remaining three issues that TEC and Bumstead raised in their initial appeal.

**3.** The boldfaced portion of Cleland's answer is the portion of his testimony the trial court refused to admit.

data is likewise unreliable. *Wilkins*, 47 S.W.3d at 499.

Cleland testified that he had joined the DPS in 1990. He showed that he had been trained in advanced accident investigation as well as advanced commercial accident reconstruction and had received over five hundred hours of training in both disciplines. Further, Cleland testified that he had personally investigated over four hundred accidents during his tenure with the DPS. We conclude that the trial judge heard sufficient testimony to establish Cleland's credentials as an expert witness.

When Cleland attempted to testify regarding his opinion concerning whether Bumstead could have avoided the cows, it was within the trial court's discretion to examine his testimony before allowing the jury to hear it. Cleland testified that he did not recall if he had ever spoken with Bumstead about his collision with the cow. Cleland stated that Officer Fulton had investigated Bumstead's collision with the cow. Further, Cleland did not ever testify that he had spoken with Fulton about his investigation of Bumstead's collision with the cow. Indeed, Cleland noted that he could not testify about Bumstead's ability to avoid the cows because that would amount to speculation. However, in his testimony before the jury, Cleland did offer his opinion as to whether Bumstead could have avoided the cows. If the foundational data underlying opinion testimony is unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 714 (Tex.1997); *see also Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995) ("When an expert's opinion is based on assumed facts that vary materially from the actual undisputed facts, the opinion is without probative value."). Here, the record fails to demonstrate that Cleland had adequate facts to enable him to form an opinion concerning whether Bumstead could have avoided the cow he hit. We hold that the trial court did not abuse its discretion in refusing to allow the jury to hear Cleland's opinion testimony. TEC and Bumstead's second issue is overruled.

### LEGAL AND FACTUAL SUFFICIENCY

■ In their third issue, TEC and Bumstead contend that the evidence of causation supporting the jury's negligence findings is neither legally nor factually sufficient.

### *Standard of Review*

In conducting a legal sufficiency review, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Construction v. Harrison*, 70 S.W.3d 778, 782 (Tex.2001). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Formosa Plastics v. Presidio Engineers*, 960 S.W.2d 41, 48 (Tex.1998).

When reviewing a jury verdict to determine the factual sufficiency of the evidence, a court of appeals must consider and weigh all of the evidence and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). This court is not a fact finder and may not pass on the credibility of the witnesses or substitute our judgment for that of the trier of fact. *Clancy v. Zale Corporation*, 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ ref'd n.r.e.). Findings of fact are the exclusive province of the jury. *See Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744 (Tex.1986). Accordingly, if there is suffi-

cient competent evidence of probative force to support the finding, it must be sustained. *Beall v. Ditmore,* 867 S.W.2d 791, 795–96 (Tex.App.-El Paso 1993, writ denied). When there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Id.* at 796.

*Analysis*

■■■ To prove negligence, the plaintiff must introduce admissible evidence that there existed a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by the breach. *Harrison,* 70 S.W.3d at 782. Proximate cause consists of two elements-cause in fact and foreseeability. *See Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Cause in fact, which may be proven by circumstantial evidence, is established if the negligent conduct was a substantial factor in bringing about the injury and without it, harm would not have occurred. *Id.* The test for foreseeability is satisfied if a person of ordinary intelligence should have anticipated the danger caused by his negligent conduct. *Id.*

Dillard contends that both of the collisions were caused by TEC's and Bumstead's negligence. She contends that the first collision was caused when TEC overloaded Bumstead's trailer with utility poles, which led to his driving too fast with a top-heavy load at the time he crested the hill and saw cows on the road. She further contends that the second collision involving Brown and the Dillards' pickup was caused by Bumstead's failure to warn Brown of the dead cow in her lane on the other side of the bridge as Brown passed Bumstead's unilluminated rig.

TEC and Bumstead contend that Bumstead was driving below the speed limit and that he did not have time to stop before striking one of the cows. They also contend that there was nothing Bumstead could have reasonably done to warn Brown before she struck the dead cow.

The uncontroverted evidence demonstrated that the dead cow was found 1,750 feet away from the crest of the hill. Bumstead testified that he saw the cows as his truck crested the hill. Bumstead acknowledged that, under reasonable circumstances, he could bring the tractor-trailer to a stop within three hundred feet. However, Bumstead testified that on the night in question, he could not stop in time because his truck was top-heavy due to the load of utility poles.

TEC and Dillard argue that Bumstead was traveling only about fifty miles per hour, well under the speed limit. They further contended that Bumstead had only between two and three seconds to respond to the cows in the road and, therefore, did not have time to stop before he hit one. We conclude that it was not unreasonable for the jury to determine from the evidence before it that Bumstead crested the hill traveling too fast considering the top-heavy load he was carrying and that such was the proximate cause of his collision with the cow.

Dillard further contends that Bumstead recognized the danger when he radioed the driver of the Arkansas Freightways truck to warn him of the dead cow lying in the road ahead and, therefore, undertook a duty to warn others of the danger. She insists that Bumstead should have kept the lights for his truck illuminated and should have activated his emergency flashers to warn oncoming traffic. Dillard also contends that Bumstead could have used a flashlight and other warning devices, such as triangles, to alert oncoming traffic that the dead cow was lying in the roadway ahead.

Bumstead responds that he did not have an opportunity to get out of his truck

before Brown collided with the cow. Bumstead testified that as he opened his door, he heard the sound of Brown's vehicle striking the Dillard vehicle and immediately saw the flashing lights of the DPS patrol car after he heard the collision. Bumstead further contends that even if he had time to get out of his vehicle to warn traffic, he could not have reasonably been expected to warn traffic from both directions. TEC and Bumstead also note that Richard Turner, the accident reconstructionist who testified on behalf of Dillard, stated that the requirements of the Texas Department of Transportation are that a trucker that has been involved in an accident has ten minutes to put out safety devices.

Joe Knight was following the Dillards' vehicle that night. Knight testified that he was a retired law enforcement officer, having served with the Cockerell Hill Police Department, the San Augustine County Sheriff's Department, the City of Irving Police Department as a sergeant, and finally as police chief for the City of Seven Points. Knight testified that he arrived at the scene of the Brown–Dillard collision at approximately 10:17 p.m. Knight further stated that he had called 9-1-1 immediately upon arriving at the scene. Knight testified that as a law enforcement officer, he had worked numerous accident scenes. He further stated that he immediately activated the emergency flashers on his car, exited his vehicle, and began using a flashlight to direct traffic around the carcass of the dead cow and the Brown–Dillard collision. Knight stated that he was able to keep the traffic safely moving around the scene until about 10:26 p.m., at which time he made a second 9-1-1 call pleading for emergency personnel to come to the scene. Phone records admitted into evidence confirm the timing of Knight's two 9-1-1 calls. Knight further testified that soon after his second 9-1-1 call, DPS Officer Jim Cleland

arrived at the east side of the bridge. Cleland's records indicate that he arrived at the scene at 10:25 p.m. after being notified of the accident at 10:20 p.m. Cleland immediately took charge of the scene and later investigated the Brown–Dillard collision on behalf of the DPS. DPS Officer Richard Fulton later arrived on the west side of the bridge and interviewed Bumstead concerning his collision with the cow.

Fulton testified that he believed Bumstead's story that the second collision occurred as he was first exiting his truck was inconsistent with the facts. Further, Knight's testimony directly contradicted Bumstead's testimony that he immediately got out of his truck after parking it and, at that point, heard Brown's car collide with the Dillards' vehicle and saw the DPS vehicle with its lights flashing. Knight further stated that he passed the Arkansas Freightways truck with the two trailers at least four miles to the east of the Brown–Dillard collision. We conclude that the jury was entitled to believe the testimony of Cleland, Fulton, and Knight that Bumstead's recollection as to the timing of the Brown–Dillard collision was inaccurate.

TEC and Bumstead argue that causation is not established if the defendant's conduct does no more than furnish the condition that makes the plaintiff's injury possible. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 776 (Tex.1995). Although *Union Pump* was a products liability case, the court cites to an earlier supreme court case concerning causation that involved two collisions. *See Union Pump,* 898 S.W.2d at 776 (citing *Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968)).

In *Bell* two automobiles had collided. *See Bell,* 434 S.W.2d at 118. A trailer attached to a vehicle in the first collision overturned and remained in the roadway.

*Id.* A crowd gathered after the collision, and a person went down the highway from the scene with a flashlight to signal to oncoming traffic that its lane of travel was obstructed. *Id.* at 119. An intoxicated driver either ignored or did not see the warnings from the person with the flashlight and drove into the crowd, injuring three people. *Id.* The supreme court held that the drivers of the two vehicles in the first collision had not proximately caused the second collision between the intoxicated driver and the three men attempting to remove the trailer from the road. *Id.* at 122–123. The court stated that "all forces involved in or generated by the first collision had come to rest, and no one was in any real or apparent danger therefrom." *Id.* at 120.

In the case at hand, the forces generated by Bumstead's collision with the cow were still continuing at the time Brown came upon the cow and vaulted into the Dillard pickup. Brown and the Dillards were in imminent danger from the remains of Bumstead's collision with the cow. Even Bumstead recognized there was a danger with a cow's carcass in the eastbound lane of the highway because he immediately radioed the approaching Arkansas Freightways trucker of its existence. We conclude that the jury could have determined that Bumstead's failure to warn Brown about the cow's carcass obstructing her lane was a cause in fact leading to Kenneth Dillard's death and the injuries to Mary and Kimberly Dillard. The jury could have further determined Bumstead's failure to warn was a substantial factor that caused the Brown–Dillard collision and that the harm would not have occurred had Bumstead successfully warned Brown of the dead cow in the roadway. Finally, the jury could have also reasonably determined that Bumstead should have anticipated further collisions because the record reflects that he did so

anticipate with respect to the driver of the Arkansas Freightways truck. Therefore, we hold there was both legally and factually sufficient evidence to establish all of the elements of negligence attributed to TEC and Bumstead. TEC and Bumstead's third issue is overruled.

### SPOLIATION PRESUMPTION

■ In their first issue, TEC and Bumstead contend that the trial court erred when it submitted the following instruction to the jury:

> You are instructed that if there is evidence that is pertinent to the issues in this cause, which was in the exclusive possession and control of a party and which cannot be produced, and its disappearance or non-production has not been satisfactorily explained, then you may consider that such evidence contained information adverse to the position taken by the party who was in the possession.

■ The loss or destruction of evidence may seriously impair a party's ability to present its case. *Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 721 (Tex. 2003). A spoliation instruction is an instruction given to the jury outlining permissible inferences they may make against a party who has lost, altered, or destroyed evidence. *Brewer v. Dowling,* 862 S.W.2d 156, 159 (Tex.App.-Fort Worth 1993, writ denied). A party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case. *Johnson,* 106 S.W.3d at 721. A trial judge has broad discretion in determining whether to provide a jury with a spoliation presumption instruction. *See Trevino v. Ortega,* 969 S.W.2d 950, 953 (Tex.1998); *see also Johnson,* 106 S.W.3d at 721 (a trial judge should have discretion to fashion an appropriate remedy to re-

store the parties to a rough approximation of their positions if all evidence were available).

In the instant case, TEC admitted that it had destroyed Bumstead's logbook and all of the other documents regarding his trip events of May 27, 1996. William Gee, the dispatcher for TEC, stated that it was the policy of TEC to keep these records for only six months and then destroy them. Gee further testified that he was the individual who had thrown away Bumstead's logbook and the other documents pertaining to his trip of May 27. He stated that he did this as part of TEC's normal operating procedure.

Dillard contends that the logbooks would have been helpful in indicating exactly how fast Bumstead had been driving during the 120 miles of this trip before he hit the cow. Dillard also contends that the destroyed documents could have shown that Dillard's trailer was overloaded and, therefore, considering the amount of his load, his speed was excessive.

Before any failure to produce material evidence may be viewed as discovery abuse, the opposing party must establish that the nonproducing party had a duty to preserve the evidence in question. *Id.* at 722. There must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance thereto. *Id.* An objective test for anticipation of litigation is whether a reasonable person would conclude from the severity of the accident and other circumstances surrounding it that there was a substantial chance for litigation. *Id.*

Dillard established that one of her attorneys, Roland Brown, wrote TEC a letter dated October 24, 1996. In his letter, Brown notified TEC that he had been employed to represent Mary Dillard and her daughter in connection with their injuries and the death of Kenneth Dillard that arose out of the Bumstead collision with the cow in Cherokee County on May 27, 1996. TEC acknowledged the receipt of Brown's letter in a letter to Brown dated October 30, 1996 from D.L. Lively, who identified himself as a manager with TEC. In his letter, Lively contested the fact that a TEC vehicle was involved in the specific collision that led to Kenneth Dillard's death and the injuries of Mary and Kimberly Dillard. It is uncontested that the correspondence between Brown and Lively occurred within six months of the May 27 collisions. Thus, the record before the trial judge indicated that TEC had knowledge of Dillard's claim and understood its severity before Gee destroyed Bumstead's logbook and other documents. We hold that the trial judge did not abuse his discretion in instructing the jury on the spoliation presumption. TEC and Bumstead's first issue is overruled.

### CONCLUSION

Having overruled TEC and Bumstead's first, second, and third issues, we *affirm* the trial court's judgment.