

NUMBER 13-09-00434-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| DUANE MUHS, INDIVIDUALLY AND AS NEXT FRIEND OF ASHTON MUHS, A MINOR, | Appellant, |
| v. | |
| WHATABURGER, INC., ROBERT GONZALEZ GARZA, AND MICHAEL LEE METTLEN, | Appellees. |

On appeal from the 357th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Vela
Memorandum Opinion by Chief Justice Valdez**

Appellant, Duane Muhs ("Muhs"), individually and as next of friend of Ashton Muhs ("Ashton"), a minor, appeals from the trial court's judgment that he take nothing on his claim for personal injuries sustained by Ashton in an auto-pedestrian accident. The jury

found that appellees, Whataburger, Inc., Robert Gonzalez Garza, and Michael Lee Mettlen were negligent, but it also found that Ashton was negligent. The jury found Mettlen grossly negligent and awarded Muhs $25,000 in punitive damages. The jury apportioned negligence and assigned 37% to Whataburger and Garza combined, 3% to Mettlen, and 60% to Ashton. Because Ashton's negligence exceeded 50%, the trial court rendered a take-nothing judgment in appellees' favor. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (Vernon 2008). Muhs appeals, arguing by seven issues that the trial court erroneously excluded key evidence during the trial and refused to include pertinent instructions and a question in the jury charge. We affirm.

## I. BACKGROUND[1]

On October 31, 2005, fourteen-year-old Ashton injured her right leg in an auto-pedestrian accident in Laguna Heights, Texas, as she attempted to cross Highway 100 on foot.[2] Ashton testified that she went to her friend's house on the evening of October 31, to meet a group of friends to go trick-or-treating. When her friend's mother failed to pick up the group to take them trick-or-treating, Ashton and four other minors decided to cross Highway 100 to go to her friend's grandmother's house and ask for a ride to Port Isabel, Texas. Ashton stated that traffic was heavy on Highway 100, and because there was no designated crosswalk, she and a friend waited at the curb for the eastbound traffic to clear. The girls then proceeded across the two eastbound lanes and waited in the center lane for westbound traffic to clear. Ashton testified that after approximately five minutes, Mettlen,

---

[1] As this is a memorandum opinion, and the parties are familiar with the facts of the case, we will only recite those facts which are necessary to advise the parties of this Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.1, 47.4.

[2] Trial testimony revealed that Highway 100 is comprised of two eastbound lanes, two westbound lanes, a center lane, and two improved shoulders.

who was driving a white Ford F-150 pickup truck, stopped in the westbound inside lane and motioned for Ashton to cross in front of his truck. Ashton stated that she remembered taking "a couple of steps" and then "[w]aking up on the street." Ashton stated that she did not walk far enough to get to the outside westbound lane. Ashton suffered an injury to her right knee that required surgery and left a scar from the middle of her thigh to her knee.

Mettlen testified that he went fishing at South Padre Island ("the Island") on the morning of October 31, 2005. While there, Mettlen consumed approximately one pint of vodka. He left the Island sometime between 6:30 p.m. and 7:00 p.m. to return to his home in Harlingen, Texas. Mettlen stated that he knew he was intoxicated when he left the Island, but he did not feel that he "was too intoxicated to drive." Mettlen left the Island driving westbound on Highway 100.

Mettlen testified that he saw children out trick-or-treating and that the traffic was "very heavy" when he entered Port Isabel. Mettlen was driving in the inside lane somewhere near Port Isabel High School when he noticed Garza driving behind him in a Chevrolet pickup truck. Mettlen testified that Garza was "driving a little faster" than he was, so Mettlen "got over in the [outside] lane" and allowed Garza to pass him. Mettlen stated that the speed limit was 35 miles-per-hour and estimated that Garza was driving at a rate of 40 miles-per-hour. After Garza passed him, Mettlen moved back over into the inside lane behind Garza. Mettlen testified that a short time later, he saw a group of people on the sidewalk on the southside of Highway 100. Mettlen stated "there was [sic] 12 or 13 people, and Ashton was the only one that ran out, and she ran right in front of Mr. Garza's pickup." Mettlen testified that Ashton was hit by the "front-end" of Garza's truck and that upon impact, Ashton "traveled a few feet in front of [Garza's] pickup truck." Mettlen

3

testified that upon seeing the accident, he pulled his truck to the side of the road and began "helping to make sure that [Ashton] did not get hit by another vehicle."

Garza testified that he does not agree with Mettlen's account of the accident. Garza, a lead technician for Whataburger, testified that on October 31, 2005, he traveled through Laguna Heights after leaving a remodeling job at the Port Isabel Whataburger. Garza was driving a white Chevrolet three-quarter ton pickup truck owned by Whataburger. Garza testified that he was in the outside westbound lane traveling at approximately 25 miles-per-hour when he entered Laguna Heights. Garza noticed Mettlen's truck ahead of him in the inside lane. Garza testified, "all of a sudden, [Mettlen] stopped and jerked his truck to my lane. At that point I broke lane [sic] with his truck and there was an impact, and I pulled over to the shoulder and I parked." Although Garza originally believed that he might have hit Mettlen's truck, when he saw Ashton lying on the ground in front of Mettlen's truck, he realized that his truck had collided with Ashton.

There was no damage to Mettlen's truck. Garza testified that his truck sustained some damage and that repairs and repainting were done to the truck's front left fender, left bumper, left front door, and left side mirror. Garza also stated that there was a horizontal, dark red mark about three quarters of an inch wide that extended along the driver's side of Garza's truck from below the windshield to above the rear tire. Garza testified that he noticed a backpack that Ashton had at the time of the collision was the same color as the mark on the side of his truck. Garza opined that the red mark was caused by Ashton's backpack and that Ashton "ran into [his] truck."

Texas Department of Public Safety Trooper Cory Pinnell investigated the October 31 collision. Trooper Pinnell testified that he spoke to Garza at the scene and that Garza

4

told him that he was traveling in the inside westbound lane of Highway 100 behind Mettlen when Mettlen stopped or slowed down. Garza told Trooper Pinnell that he "changed to the outside lane to go around [Mettlen's] vehicle, and as he was going around it, he heard that he hit something . . . didn't know what it was, didn't see anything." Garza "assumed that he had struck" Mettlen's truck and parked on the shoulder. However, "as [Garza] got out, he realized that he had struck [Ashton]." Trooper Pinnell also testified as to the what Mettlen told him while at the scene of the accident. Mettlen told Pinnell that "he observed some trick-or-treaters [who] were in the center turn lane. [Mettlen] stopped and motioned, you know, told them to go ahead and cross in front of him. He stopped his vehicle to allow them to cross, and that's when [Ashton] got hit."

Trooper Pinnell noticed damage on Garza's truck "[o]n the left front quarter panel up around the front headlight, turn signal, in front of the tire area." Trooper Pinnell testified that he did not notice a red mark along the driver's side of Garza's truck; however, on cross-examination, he admitted that in an earlier deposition he had stated that he had seen a red mark along the side of Garza's truck. Trooper Pinnell stated that a red mark on Garza's truck could suggest the possibility of a side-swipe and that the mark "could have been" made by Mettlen's passenger-side mirror as Garza's truck passed by. However, Trooper Pinnell testified that there was "no evidence to support" the conclusion that Garza's vehicle moved into Mettlen's lane and hit Mettlen's truck. Trooper Pinnell opined that the accident occurred when Ashton "took a step into the outside lane or jogged into the outside west[]bound lane, and collided with [the side of Garza's truck]."

The jury found each of the parties negligent, found Mettlen grossly negligent, and awarded Ashton $25,000 in punitive damages. The jury apportioned responsibility as

5

follows: 60% to Ashton; 37% to Whataburger and Garza combined; and 3% to Mettlen. A take-nothing judgment was rendered in favor of the appellees. *See id.* This appeal ensued.

## II. EVIDENTIARY RULINGS

By his first, fifth, and sixth issues, Muhs contends, respectively, that the trial court erred by excluding: (1) his testimony, diagrams, photographs and video recordings that related to the "theoretical possibility" that Garza's truck sideswiped Mettlen's vehicle; (2) evidence of "Mettlen's prior recent incident of public intoxication and possession of Valium"; and (3) evidence of "Mettlen's four subsequent automobile accidents."

### A.    Standard of Review

The exclusion of evidence is a matter within the "sound" discretion of the trial court. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *State Office of Risk Mgmt. v. Trujillo*, 267 S.W.3d 349, 351 (Tex. App.–Corpus Christi 2008, no pet.). Thus, we review the exclusion of evidence under an abuse of discretion standard. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Trujillo*, 267 S.W.3d at 351. A trial court abuses its discretion if it acts arbitrarily or without reference to guiding rules and principles. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Trujillo*, 267 S.W.3d at 351.

For the exclusion of evidence to constitute reversible error, the complaining party must show that (1) the trial court committed error, and (2) the error probably caused the rendition of an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or

6

admitted.  *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).  In making this determination, we review the entire record.  *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008); *Nissan Motor Co.*, 145 S.W.3d at 144.

## B.      Exclusion of Muhs's Testimony and Related Evidence

By his first issue, Muhs contends that "[t]he trial court erred in excluding [his] testimony and his diagrams of the accident scene," as well as "his photographs and video recording of the pickups[,] which showed that a sideswipe probably occurred."

Although Muhs was allowed to testify at trial, the trial court refused to allow him to present testimony regarding the possibility that Garza's truck sideswiped Mettlen's truck before colliding with Ashton.  Muhs did not witness the October 31, 2005 accident; however, in an offer of proof outside the presence of the jury, Muhs testified that after Trooper Pinnell's deposition was taken on December 3, 2008, he went to the scene of the accident to research the theoretical possibility that Garza's vehicle sideswiped Mettlen's vehicle and struck Ashton in Mettlen's lane.  Muhs took measurements and made "to-scale diagrams" of the scene.  Muhs later located Garza's truck and a Ford F-150 that he described as "identical" to the Ford that Mettlen was driving at the time of the accident.[3] Muhs took photographs and measurements of the vehicles.  Muhs testified that, upon inspection of Garza's truck, he observed a repaired horizontal scratch along the driver's side of the truck as well as an "impact crack" on the outside of the truck's driver's side mirror.  Using Garza's truck and the F-150 Muhs deemed "identical" to Mettlen's, Muhs filmed a video, wherein he attempted to "recreate the streak" on Garza's truck by taping

---

[3] Muhs acknowledged that Mettlen had sold his Ford F-150 to a buyer in Mexico; thus, Muhs was unable to inspect the specific Ford F-150 that Mettlen had been driving at the time of the accident.

a dry erase marker to the "furthest-most point" on the F-150 and driving Garza's truck alongside it. Muhs testified that he was able to match the mark made by the dry erase marker to the horizontal scratch on Garza's truck by "turn[ing] left into the inside lane across the front of the Ford [F-150] pickup." Based on his observations and measurements, Muhs testified that the scratch on Garza's truck could have been caused by Garza sideswiping the passenger's side mirror of Mettlen's F-150 truck.

In ruling that the above evidence be excluded, the trial court stated:

> This quite clearly is an accident reconstruction hypothetically alleging a sideswipe, and for all of the reasons that have been mentioned, and in no particular order, Mr. Muhs is not an expert.

> The hypothetical testing was done in February of 2009, and in conjunction with the rules of procedure and rules of evidence that apply to this case, his testimony relevant to these issue [sic] will not be allowed.

Accident reconstruction constitutes scientific evidence. *See Waring v. Wommack*, 945 S.W.2d 889, 892 (Tex. App.–Austin 1997, no writ). Rule 702 of the Texas Rules of Evidence provides that if scientific knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Thus, "Texas has a long history of allowing qualified accident reconstruction experts to testify regarding the way in which an accident occurred." *Lincoln v. Clark Freight Lines, Inc.*, 285 S.W.3d 79, 83 (Tex. App.–Houston [1st Dist.] 2009, no pet.) (citing *Chavers v. State*, 991 S.W.2d 457, 460-61 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd); *Waring v. Wommack*, 945 S.W.2d 889, 893 (Tex. App.–Austin 1997, no writ); *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 483 (Tex. App.–Corpus Christi 1990, writ denied); *DeLeon v. Louder*, 743 S.W.2d 357, 359 (Tex. App.–Amarillo 1987), *writ denied*

8

*per curiam*, 754 S.W.2d 148 (Tex. 1988); *Bolstad v. Egleson*, 326 S.W.2d 506, 519 (Tex. Civ. App.–Houston 1959, writ ref'd n.r.e.)).

Whataburger argues that Muhs's testimony and related evidence constitutes accident reconstruction evidence and, because Muhs was not qualified as an expert, was properly excluded. Muhs concedes that he was not qualified as an expert witness but insists that "arguments about his qualifications or designation as an expert are irrelevant" because he only intended to testify regarding his "observations" and did not intend to provide any testimony regarding accident reconstruction. We disagree.

During Muhs's offer of proof, his attorney asked:

Q.   In addition to—in addition to these measurements of the scene, did you research the theoretical possibility of a sideswipe between Mr. Garza's vehicle and Mr. Mettlen's stopped Ford pickup?

A.   Yes, I did.

Q.   And after researching the theoretical possibility of it, did you actually go out and start measuring vehicles to see if that could happen?

A.   Yes, preliminary, yes.

Q.   And after your preliminary measurements, did you start to think that maybe this could have happened?

A.   Very much so.

. . . .

Q.   . . . And you were trying to figure out what put this streak scratch [sic] down the side of Mr. Garza's truck?

A.   Most definitely.

Q.   All right. And it was your feeling that a mirror on a F-150 identical to that that Mr. Mettlen was driving could have caused this scratch?

A.   Yes. As Trooper Pinnell said, it had to be from another vehicle

9

because it stayed in a horizontal position.

. . . .

Q.   —did you try to recreate the streak on this [Garza's] truck shown on Plaintiff's Exhibit 19?

A.   Yes, I did.

Q.   And what was—how were you able to do that, or were you able to do that?

A.   Yes, I was.

Q.   How were you able to do that?

A.   I had to turn left into the inside lane across the front of the Ford pickup to do so.

. . . .

Q.   Okay. Would that explain how your daughter was hit by the corner of that truck?

A.   It would be very consistent with all the testimony, including her own, that she never got out from in front of [Mettlen's] Ford truck.

Q.   And that shows how it could actually happen?

A.   It did.

Muhs neither witnessed the accident, nor inspected the vehicles or scene immediately after the accident; instead, Muhs made his "observations" in conjunction with, and as a result of, his attempt to "research the theoretical possibility of a sideswipe" between Garza's vehicle and Mettlen's F-150 by demonstrating that the repaired scratch that Muhs claimed to have located on the side of Garza's vehicle was caused by contact with Mettlen's passenger side mirror. Moreover, the above testimony demonstrates that Muhs sought to offer more than mere "observations" of the vehicles involved in the incident

10

in question. It is clear that Muhs's "feeling that a mirror on a F-150 identical to that that Mr. Mettlen was driving could have caused this scratch" was based on his reconstruction of the positions of the vehicles at the time of the accident. Accordingly, the trial court did not abuse its discretion by excluding Muhs's testimony and related exhibits because (1) the court was within its discretion to conclude that Muhs was in fact being called as an expert in accident reconstruction, *see Lopez v. Foremost Paving, Inc.*, 796 S.W.2d 473, 481 (Tex. App.–San Antonio 1990, writ dism'd); and (2) Muhs concedes that he was not qualified as an expert witness. *See* TEX. R. EVID. 702. Accordingly, we overrule Muhs's first issue.

## C.     Exclusion of Mettlen's Prior Arrest

By his fifth issue, Muhs contends that the trial court erred in excluding evidence of Mettlen's prior arrest for public intoxication and possession of a controlled substance.

Muhs testified that went fishing at the Island on the morning of October 31, 2005, and consumed approximately one pint of vodka. Mettlen stated that when he left the Island that evening he knew he was intoxicated, but did not feel that he "was too intoxicated to drive." Mettlen denied stopping and motioning for Ashton to cross in front of his truck and insisted that Garza was approximately 200 to 300 yards in front of him in the inside lane when Garza's vehicle collided with Ashton. Upon seeing Ashton lying on the ground, Mettlen pulled his truck to the side of the road and "help[ed] make sure that [Ashton] did not get hit by another vehicle." Mettlen testified that he spoke to police at the scene and gave a statement before returning to his vehicle and driving off.

Officers pulled Mettlen over just outside Laguna Heignts and took him back to the scene of the accident. Mettlen was arrested for driving while intoxicated ("DWI"). A breathalyzer examination revealed that his blood alcohol content was almost twice the legal

11

limit. Mettlen was also charged with possession of a controlled substance after officers found Valium in his pocket. Mettlen later pleaded guilty to possession of a controlled substance, and the DWI charge was dropped.

At trial, Muhs sought to introduce evidence that Mettlen had been arrested three weeks before the October 31, 2005 accident. Muhs's offer of proof revealed that Mettlen was arrested for public intoxication by the Kingsville Police Department on October 9, 2005, and was found to be in possession of Valium. On appeal, Muhs contends that the evidence of Mettlen's prior arrest for public intoxication and possession of Valium should have been admitted because it "is evidence of a wanton and willful disregard for the safety of others and relevant to [Muhs's] gross negligence claim."

Rule 404 of the Texas Rules of Evidence generally prohibits evidence of a person's other crimes from being admitted into evidence; however, Muhs argues that the evidence of Mettlen's October 9 arrest should have been admitted as an exception to rule 404 because it constitutes evidence of Mettlen's state of mind at the time of the accident. *See* TEX. R. EVID. 404(b) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show conformity therewith."); *Castro v. Sebesta*, 808 S.W.2d 189, 194 (Tex. App.–Houston [1st Dist.] 1991, no writ) (holding that the trial court erred in excluding testimony that appellant regularly smoked marihuana while driving a car because, when punitive damages and gross negligence are at issue, the appellant's state of mind is relevant to prove the level of culpability).

Assuming without deciding that the trial court did err in excluding this evidence, we nonetheless conclude that it did not cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). Muhs claims that the trial court erred in excluding evidence of

12

Mettlen's prior arrest because the evidence "was admissible for the purpose of proving his gross negligence." However, Muhs's argument ignores the fact that although the jury apportioned only 3% of the fault of the accident to Mettlen, it also expressly found that Mettlen was grossly negligent and awarded $25,000 in punitive damages. Thus, because the jury entered a favorable finding as to Muhs on the issue of Mettlen's gross negligence, the trial court's exclusion of Mettlen's prior arrest caused no harm to Muhs. *See id.* Accordingly, we overrule Muhs's fifth issue.

## D.    Exclusion of Mettlen's Subsequent Automobile Accidents

By his sixth issue, Muhs challenges the trial court's exclusion of evidence of Mettlen's involvement in four automobile accidents that occurred after the date in question. During trial, Muhs called Mettlen as an adverse witness and questioned him, in pertinent part:

> Q.    Do you believe drivers should be extra careful on Halloween to be on the lookout for children?
>
> A.    Certainly.
>
> Q.    Were you trying to drive carefully?
>
> A.    Always.
>
> Q.    And you were trying to drive carefully because you knew you were intoxicated?
>
> A.    Yes, sir, but I drive carefully anyway.
>
> Q.    You're telling the jury that you're a careful driver?
>
> A.    Yes, I am.
>
> Q.    Do you want this jury to believe that you are a careful driver?
>
> A.    Well, I would think so.

13

. . . .

Q.     Are you trying to tell this jury, again, that you are a careful driver?

A.     During that evening, of course.

. . . .

Q.     Didn't you say that to the jury, that you are a careful driver?

A.     Yes, I am a careful driver.

The record reflects that Mettlen was involved in four automobile accidents after October 31, 2005.[4]  Muhs asserts that evidence of these subsequent accidents should have been admitted "for the limited purpose of impeachment" because Mettlen "opened the door" to such questioning by "leav[ing] the jury with the false impression that he was 'always' a 'careful' driver."

Although, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime . . . may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence," TEX. R. EVID. 608(b), a trial court may admit evidence necessary to explain a matter on which the opposing party has "opened the door."  *See* TEX. R. EVID. 107.  However, "[e]vidence which is not relevant is inadmissible." *Id.* at R. 402. Mettlen contends that the trial court did not err by excluding evidence of his subsequent automobile accidents because such evidence is irrelevant and unfairly prejudicial.  Assuming without deciding that the trial court did err in excluding this evidence, we nonetheless conclude that it did not cause the rendition of an improper judgment.  *See* TEX. R. APP. P. 44.1(a).

---

[4] Through an offer of proof, Muhs presented evidence of Mettlen's involvement in automobile accidents that occurred on August 8, 2007, December 10, 2007, August 16, 2008, and November 26, 2008.

The proportionate responsibility statute requires the jury to determine the percentage of responsibility with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a) (Vernon 2008). "[A] claimant may not recover damages if his percentage of responsibility is greater than 50 percent." *Id.* § 33.001. At trial, Mettlen testified that he was a careful driver; however, this testimony was undermined by Mettlen's own admission that he consumed a pint of vodka on the day in question, was arrested for DWI at the scene of the accident, and failed a breathalyzer test with a blood alcohol content that was nearly twice the legal limit. In light of the foregoing, we see nothing to indicate that Mettlen probably would have been apportioned a higher percentage of fault—or that Ashton's proportionate responsibility would have been decreased—had the evidence of Mettlen's subsequent automobile accidents been admitted. *See* TEX. R. APP. P. 44.1(a).

Moreover, in question one of the jury charge, the jury found all three parties to be negligent. Muhs does not argue that the jury's answer on the negligence question would have been different if the complained of evidence had been admitted. Instead, he contends that the trial court's erroneous exclusion of the evidence probably caused the rendition of an improper judgment because the jury would not have reached the same apportionment of liability if the evidence of Mettlen's subsequent automobile accidents had been admitted. *See id.* Despite this assertion, Muhs fails to adequately explain how he was harmed by the trial court's exclusion of Mettlen's subsequent arrests. *See id.* at R. 38.1(i), 44.1; *see also Rio Grande Reg'l Hosp., Inc. v. Villarreal*, No. 13-08-00542-CV, 2010 WL 3810019, at *25 (Tex. App.–Corpus Christi Sept. 30, 2010, no pet. h.).

15

Specifically, Muhs fails to explain how the jury's proportionate responsibility calculations would change if evidence of Mettlen's subsequent automobile accidents was admitted. Moreover, Muhs does not assert that the admission of the excluded evidence would reduce Ashton's percentage of responsibility below fifty percent and convert the take-nothing judgment into a judgment under which damages could be awarded. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001. Because Muhs has failed to articulate the harm, if any, caused by the exclusion of Mettlen's subsequent automobile accidents, we cannot conclude that the exclusion of this evidence probably caused the rendition of an improper judgment. *Rio Grande Reg'l Hosp., Inc.*, 2010 WL 3810019, at *25. Accordingly, we overrule Muhs's sixth issue.

### III. CHARGE ERROR

By his second, third, and fourth issues, Muhs argues that the trial court erred by refusing to submit various instructions concerning Texas highway laws, voluntary undertaking of duty, and spoliation of evidence. By his seventh issue, Muhs contends that the trial court erred by failing to submit a separate question concerning whether Mettlen committed intoxication assault.

### A.    Standard of Review and Applicable Law

The standard of review for alleged error in the jury charge is abuse of discretion. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). "When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Id.* (citing *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000)); *see also* TEX. R. CIV. P. 277 (providing that

16

"[t]he court shall submit such instructions and definitions as shall be proper to enable the jury to vender a verdict"), 278 (providing that "[t]he court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence").

Trial courts are afforded considerable discretion when submitting instructions, and although trial courts must explain any technical or legal terms to the jury, they possess wide discretion to determine whether such explanations are sufficient. *Lumbermens Mut. Cas. Co. v. Garcia*, 758 S.W.2d 893, 894 (Tex. App.–Corpus Christi 1988, writ denied); *K-Mart Corp. v. Trottie*, 677 S.W.2d 632, 636 (Tex. App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.). A trial court abuses its discretion if it acts arbitrarily or without reference to guiding rules and principles. *Walker*, 827 S.W.2d at 840.

We will not reverse a jury verdict for the trial court's refusal to submit an instruction unless the refusal probably caused the rendition of an improper judgment or probably prevented the complaining party from presenting the case on appeal. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009); *Shupe*, 192 S.W.3d at 579. Charge error is generally considered harmful if it relates to a contested, critical issue. *Hawley*, 284 S.W.3d at 856. "Error in the omission of an issue is harmless 'when the findings of the jury in answer to other issues are sufficient to support the judgment.'" *Shupe*, 192 S.W.3d at 579 (quoting *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980)); *see also Alvarado*, 897 S.W.2d at 752 (noting that a jury question may be immaterial, and therefore its submission harmless, "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict").

B.      **Texas Transportation Code and Voluntary Undertaking of Duty**

By his second issue, Muhs argues that the trial court's refusal to instruct the jury on various provisions of the Texas Transportation Code in connection with the general negligence question submitted to the jury resulted in an erroneous jury charge.[5] Specifically, Muhs contends that the following instructions were necessary:

> **Driving on Roadway Laned for Traffic.** An operator on a roadway divided into two or more clearly marked lanes for traffic, (1) shall drive as nearly as practical entirely within a single lane, and (2) may not move from the lane unless that movement can be made safely. . . .

> **Following Distance.** An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles so that, considering the speed of the vehicles, traffic, and the conditions of the highway, the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway. . . .

> **Maximum Speed Requirement.** An operator may not drive at a speed greater than is reasonable and prudent under the circumstances then existing. . . .

> **Maximum Speed Requirement.** An operator may not drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for actual and potential hazards then existing. . . .

> **Maximum Speed Requirement.** An operator shall control the speed of the vehicle as necessary to avoid colliding with another person or vehicle that is

---

[5] The general negligence question was submitted to the jury as follows:

The law requires that a pedestrian shall yield right of way to a vehicle in the highway if crossing a roadway at a place other than a marked crosswalk or at an unmarked crosswalk at an intersection. A failure to comply with this law is negligence in itself.

Did the negligence, if any, of those named below proximately cause the occurrence in question?

Answer "Yes" or "No" for each of the following:

| | | |
|---|---|---|
| a. | Ashton Muhs | yes |
| b. | Whataburger, Inc. and Robert Gonzalez Garza | yes |
| c. | Michael Lee Mettlen | yes |

At trial, Muhs did not object to the above instruction regarding pedestrians yielding right-of-way; moreover, he does not challenge its inclusion on appeal.

18

on or entering the highway in compliance with law and the duty of each person to use due care. . . .

**Maximum Speed Requirement.** An operator shall drive at an appropriate reduced speed if a special hazard exists with regard to traffic, including pedestrians, or weather or highway conditions. . . .

**Drivers to Exercise Due Care.** The operator of a vehicle shall, (1) exercise due care to avoid colliding with a pedestrian on a roadway, (2) give warning by sounding the horn when necessary, and (3) exercise proper precaution on observing a child or an obviously confused or incapacitated person on a roadway. . . .

(Emphasis in original). *See* TEX. TRANSP. CODE ANN. §§ 545.060, 545.062(a), 545.351(a), (b), (c)(5), 552.008 (Vernon 1999). Muhs argues that the trial court's exclusion of the above instructions prevented the jury from rendering a proper verdict because it was unable "to properly determine who had the right-of-way."

Additionally, by his third issue, Muhs asserts that the trial court erred by refusing to include the following instruction:

**Voluntary Undertaking of Duty.** You are instructed that a person who undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other person will not be injured thereby. A person who owes no legal duty, but who gratuitously acts, assumes a duty to act with reasonable care so as to prevent harm to another.

(Emphasis in original). Muhs argues that the evidence demonstrates that if Mettlen had the right-of-way, he voluntarily yielded it when he gestured to Ashton to "cross in front of his pickup truck" and that "[a]s a grown adult, Mettlen assumed the responsibility of acting reasonably when he gestured a 14-year-old girl to enter his lane . . . ." Muhs insists that "the jury was 'confused' in deliberating the negligence of the parties" because of the trial court's refusal to submit the above instruction.

In *Brookshire Bros., Inc. v. Lewis*, a broad-form negligence instruction was

19

submitted to the jury without explanatory instructions regarding the specific duties employers owe to their employees. 997 S.W.2d 908, 921 (Tex. App.–Beaumont 1999, pet. denied). The court of appeals noted that a trial court is required to give definitions of legal and technical terms and states that "[a]nything else, however interesting or relevant to the case in general, that does not aid the jury in answering the issues, must be excluded." *Id.* The *Brookshire Bros.* court held that because "[t]he jury was properly instructed on the terms of 'negligence,' 'ordinary care,' and 'proximate cause,'" the explanatory instructions constituted "surplus instructions" and were properly excluded. *Id.*

In the present case, the jury was asked to determine whether each of the three parties was negligent. As in *Brookshire Bros.*, the jury charge instructed the jury on the terms of "negligence," "ordinary care," and "proximate cause." Thus, the excluded instructions were not reasonably necessary to enable the jury to render a proper verdict and were properly excluded as surplus instructions. *See id.* Accordingly, the trial court's refusal to instruct the jury with these instructions was not an abuse of discretion. *See id.*

Moreover, although Muhs contends that the trial court's refusal to submit the above instructions probably caused the rendition of an improper judgment, he fails to adequately explain how he was harmed by the trial court's exclusion of the instructions. *See* TEX. R. APP. P. 38.1(i), 44.1; *Rio Grande Reg'l Hosp.*, 2010 WL 3810019, at *25. Specifically, Muhs fails to explain how the jury's proportionate responsibility calculations would change if the above instructions had been included in the jury charge. Furtermore, Muhs does not assert that the admission of the above instructions would reduce Ashton's percentage of responsibility below fifty percent and convert the take-nothing judgment into a judgment under which damages could be awarded. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001.

20

Because Muhs has failed to articulate the harm, if any, caused by the exclusion of the above instructions, we cannot conclude that their exclusion probably caused the rendition of an improper judgment. *See Rio Grande Reg'l Hosp., Inc.*, 2010 WL 3810019, at \*25. Accordingly, we overrule Muhs's second and third issues.

## C.    Spoliation

By his fourth issue, Muhs contends that the trial court erred by refusing to include an instruction on spoliation in the jury charge. Specifically, Muhs contends that Sandra Hale, Whataburger's director of risk management, "negligently or intentionally" destroyed photographs that showed the damage that Garza's vehicle sustained in the October 31, 2005 incident. Muhs argues that the photographs would have assisted him in proving that Garza's truck sideswiped Mettlen's vehicle before hitting Ashton and that the trial court's refusal to submit a spoliation instruction "was harmful and probably caused or contributed to an improper judgment."

During trial, Hale testified that she is Whataburger's director of risk management and is responsible for overseeing "third party administrators for [Whataburger's] non-subscriber workers comp program and general liability and property damage for Whataburger buildings." Hale stated that liability claims against Whataburger employees who drive vehicles do not fall under her department. The jury heard evidence that while Hale was conducting a class at a Whataburger training center in the Rio Grande Valley, she learned of Garza's October 31, 2005 collision. Hale testified that after the incident, she took "less than five" photographs of Garza's truck with her Sprint cellular telephone, but never printed out the photos. Hale stated that she was unable to produce the photographs at trial because she no longer had access to them. Hale explained that in 2006, she

21

switched her cell phone provider from Sprint to Verizon in order to take advantage of the OnStar feature, which required Verizon, in a new vehicle that she had purchased. Hale testified that she attempted to retrieve the photographs in 2008 at the request of Whataburger's attorney by contacting Sprint via telephone and online chat. A Sprint representative informed Hale that because her Sprint account was no longer active, the photographs were unavailable.

When asked her purpose for photographing Garza's truck, Hale stated, "No purpose, in case someone needed them for the future, but no purpose at all." Hale testified that at the time she photographed the truck she "wouldn't have known" that a lawsuit concerning the October 31, 2005 incident would be filed.

"A spoliation instruction is an instruction given to the jury outlining permissible inferences they may make against a party who has lost, altered, or destroyed evidence." *Tex. Elec. Coop. v. Dillard*, 171 S.W.3d 201, 208 (Tex. App.–Tyler 2005, no pet.) (citing *Brewer v. Dowling*, 862 S.W.2d 156, 159 (Tex. App.–Fort Worth 1993, writ denied)). The use of a spoliation instruction is generally limited to two circumstances: (1) the deliberate destruction of relevant evidence; and (2) the failure of a party to produce relevant evidence or to explain its non-production. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003) (citing *Anderson v. Taylor Publ'g Co.*, 13 S.W.3d 56, 61 (Tex. App.–Dallas 2000, pet. denied)). Under the first circumstance, a party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case. *Id.* at 721-22 (citing *Williford Energy Co. v. Submergible Cable Servs., Inc.*, 895 S.W.2d 379, 389-90 (Tex. App.–Amarillo 1994, no writ); *Brewer*, 862 S.W.2d at 159). Under the second circumstance, the presumption arises because the party controlling the missing

22

evidence cannot explain its failure to produce it. *Id.* at 722 (citing *Watson v. Brazos Elec. Power Coop., Inc.*, 918 S.W.2d 639, 643 (Tex. App.–Waco 1996, writ denied)). "The presumption does not apply when documents are merely lost." *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 227 (Tex. App.–Amarillo 2003, no pet.) (citing *Williford Energy Co.*, 895 S.W.2d at 389-90); *Brewer*, 862 S.W.2d at 160. A trial court may be guided by the following three factors in determining whether a spoliation presumption is justified: (1) whether there was a duty to preserve evidence; (2) whether the alleged spoliator either negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the nonspoliator's ability to present its case or defense. *Trevino v. Ortega*, 969 S.W.2d 950, 954-55 (Tex. 1998) (Baker, J., concurring); *Whirlpool Corp. v. Camacho*, 251 S.W.3d 88, 102 (Tex. App.–Corpus Christi 2008), *rev'd on other grounds*, 298 S.W.3d 631 (Tex. 2009).

Assuming there was a duty to preserve the evidence, the trial court did not abuse its discretion in refusing to submit a spoliation instruction because Whataburger explained its non-production of the photographs and there is no evidence that the photographs were either negligently or intentionally spoliated or that the alleged spoliation prejudiced Muhs's ability to present his case. *See Johnson*, 106 S.W.3d at 721-22; *Whirlpool*, 251 S.W.3d at 102. Hale testified that she took "less than five" photographs of Garza's truck on her Sprint cellular phone. Although Hale testified that she had emailed an internet link to access the photos to someone investigating the case, there is no evidence that Hale was ever in possession of hard copies of the photos that she had taken. In 2006, Hale switched from Sprint to Verizon in order use the OnStar feature in her vehicle. Unbeknownst to Hale, upon terminating her Sprint account, access to all of the

23

photographs that she had taken on her Sprint phone were no longer available. Hale testified that as a result, she was no longer able to view photographs—those of Garza's truck as well as personal photographs—that she had taken with her Sprint phone. In light of this evidence, the trial court could have concluded that Whataburger did not negligently or intentionally destroy the photographs of Garza's truck. *See Williford Energy Co.*, 895 S.W.2d at 389-90; *Brewer*, 862 S.W.2d at 160.

Moreover, Garza testified that his truck sustained damage as a result of the October 31, 2005 incident, and he marked photographs of his truck to indicate the location of the red mark that ran horizontally down the driver's side of his truck. Thus, any harm caused by the non-production of the photographs was minimal in light of Garza's testimony and the cumulative nature of the evidence and did not prejudice Muhs's ability to present his case. *See Whirlpool Corp.*, 251 S.W.3d at 102. Thus, after reviewing the record, we cannot conclude that the trial court abused its discretion by refusing to submit a spoliation instruction. We overrule Muhs's fourth issue.

## D. Intoxication Assault

By his seventh issue, Muhs argues that the trial court erred by failing to submit the following question:

> Do you find by a preponderance of the evidence that Michael Lee Mettlen, by accident or mistake, while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication, caused serious bodily injury to Ashton Muhs?

> "Serious bodily injury" means injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

> "Intoxicated" means:

24

(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or

(B) having an alcohol concentration of 0.08 or more.

"Alcohol concentration" means the number of grams of alcohol per:

(A)  210 liters of breath;

(B)  100 milliliters of blood; or

(C)  67 milliliters of urine.

Litigants are entitled to have controlling fact issues submitted to the jury. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995). During trial, Mettlen admitted that he was intoxicated at the time of the October 31, 2005 incident, and it was undisputed that Ashton sustained serious bodily injury. Thus, the only fact issue was whether Mettlen's intoxication was a cause of the accident. The trial court submitted broad-form negligence and gross negligence questions to the jury, and the jury found that a portion of the harm suffered by Ashton was caused by Mettlen's negligence and gross negligence.

Texas Rule of Civil Procedure 278 provides that "[a] judgment shall not be reversed because of the failure to submit other various phases or different shades of the same question." TEX. R. CIV. P. 278. Under the facts of this case, the intoxication assault question was merely a different shade of the negligence question. *See id.*; *Sheldon L. Pollack Corp. v. Falcon Indus., Inc.*, 794 S.W.2d 380, 383 (Tex. App.–Corpus Christi 1990, writ denied). Accordingly, the trial court did not abuse its discretion in refusing to submit a jury question concerning intoxication assault. We overrule Muhs's seventh issue.

## IV. Conclusion

Having overruled all of Muhs's issues, we affirm the judgment of the trial court.

_____

ROGELIO VALDEZ
Chief Justice

Delivered and filed the
18th day of November, 2010.

26